## Case No. 14,782.

UNITED STATES v. CHAPELS et al.

[Brunner, Col. Cas. 444;[1] 2 Wheeler, Cr. Cas. 205.]

Circuit Court, D. Virginia. July, 1819.

### PIRACY—WHAT CONSTITUTES.

The crime of piracy is defined with reasonable certainty by the law of nations, and by the acts of congress, and consists of robbery or forcible depredation upon the sea.

[2] [The following preliminary remarks are explanatory of the case.

[The constitution of the United States confers on congress the power "to define and punish piracies and felonies committed on the high seas, and offences against the law of nations." Article 1, § 8. "The Federalist" (No. 42) says this power "belongs with equal propriety to the general government; and is a still greater improvement on the articles of confederation. These articles contain no provision for the case of offences against the law of nations: and consequently leave it in the power of any indiscreet member to embroil the confederacy with foreign nations. The provision of the federal articles on the subject of piracies and felonies, extends no farther than to the establishment of courts for the trials of these offences. The definition of piracies might, perhaps, without inconveniency, be left to the law of nations: though a legislative definition of them is found in most municipal codes."

[On the 30th April, 1790 [1 Stat. 112], congress passed "An act for the punishment of certain crimes against the United States," (among others, the crime of piracy,) the 8th section of which is in these words: "And be it enacted, that if any person or persons shall commit upon the high seas, or in any river, haven, basin, or bay, out of the jurisdiction of any particular state, murder or robbery, or any other offence which if committed within the body of a county, would by the laws of the United States be punishable with death; or if any captain or mariner of any ship or other vessel, shall piratically and feloniously run away with such ship or vessel, or any goods or merchandise to the value of fifty dollars, or yield up such ship or vessel voluntarily to any pirate; or if any seaman shall lay violent hands upon his commander, thereby to

[1] [Reported by Albert Brunner, Esq., and here reprinted by permission.]

[2] [From 2 Wheeler, Cr. Cas. 205.]

hinder and prevent his fighting in defence of his ship or goods committed to his trust, or shall make a revolt in the ship; every such offender shall be deemed, taken, and adjudged to be a pirate and felon, and being thereof convicted shall suffer death: and the trial of crimes committed on the high seas, or in any place out of the jurisdiction of any particular state, shall be in the district where the offender is apprehended, or into which he may first be brought."

[At the February term of the supreme court of the United States, 1818, however, there came on the case of U. S. v. Palmer [3 Wheat. (16 U. S.) 610] certified from the circuit court for the Massachusetts district. Palmer and others, citizens of the United States, had gone upon the high seas, entered and robbed the Industri Raffaelli, a Spanish ship, of various articles. In this case, the question arose, (to use the language of the chief justice,) "whether this act extends farther than to American citizens, or to persons on board American vessels, or to offences committed against citizens of the United States. The constitution having conferred on congress the power of defining and punishing piracy, there can be no doubt of the right of the legislature to enact laws punishing pirates, although they may be foreigners, and may have committed no particular offence against the United States. The only question is, has the legislature enacted such a law? Do the words of the act authorize the courts of the Union to inflict its penalties on persons who are not citizens of the United States, nor sailing under their flag, nor offending particularly against them?" The court finally came to the decision, that "the crime of robbery, committed by a person on the high seas, on board of any ship or vessel belonging exclusively to subjects of a foreign state, on persons within a vessel belonging also exclusively to subjects of a foreign state, is not a piracy within the true intent and meaning of the act 'for the punishment of certain crimes against the United States,' and is not punishable in the courts of the United State."

[To supply this omission, a new provision was deemed to be necessary; and it is understood, that with this intention the last congress adopted the 5th section of the "act to protect the commerce of the United States, and punish the crime of piracy," passed on the 3d of March, 1819 [3 Stat. 513]. The 5th section is in these words: "And be it further enacted, that if any person or persons whatsoever, shall, on the high seas, commit the crime of piracy as defined by the law of nations, and such offender or offenders shall, afterwards be brought into, or found in, the United States, every such offender or offenders shall, upon conviction thereof, before the circuit court of the United States for the district into which he or they may be brought, or in which he or they shall be found, be punished with death."

[On Monday, the hall of the house of delegates was filled by a large concourse of spectators. The court was opened; the chief justice on the bench. Mr. Stanard, the United States' attorney, appeared on the part of the United States; Messrs. A. Stevenson, and W. Wickham,. on the part of the prisoners; Messrs. Gilmer and Bouldin, the two other counsel whom the court had added to the defence, being prevented from attending—the first by indisposition, the last by absence. The prisoners William Chapels and others, (twenty-one in number) had been variously charged in three different indictments; one (under the act of 1819) was for robbing a Spanish vessel; another. under the same act, for robbing a Dutch vessel; the third, under the act of 1790. for robbing an American vessel. Samuel Poole was first put to the bar, under the first indictment charged with having piratically and feloniously set upon. boarded, broke, and entered "a certain Spanish vessel or brig, belonging to certain persons whose names are, as well as is that of the said brig, unknown," and robbed her of Spanish milled dollars. The prisoner being arraigned. and the jury impannelled, seven witnesses were sworn in.

[Evidence:

[Samuel Stanly, a youth of 18. gave a clear and particular statement of the transaction. He stated, that he had belonged to the armed vessel the Irresistible; that while she was lying in the port of Margaritta, about a mile from shore, about 1 o'clock in the morning. she was cut out by the crew of the privateer Creola. Such of the crew of the Irresistible, as wished to go ashore, were permitted to do so. The crew of the Creola said they were going to continue the cruise. They did go on a cruise. They went off St. Domingo, where they did but little; but off Cape Antonio, in the island of Cuba, they met with several vessels. Q. What colours did you assume? A. No particular ones; sometimes one flag, sometimes another; flags of different nations. Q. Who appointed the officers, and how? A. They were appointed by the crew of the Creola; (but witness could not tell particularly the manner of their appointment.) They brought to a Spanish vessel off Cape Antonio, from whom they took $2300. During all the time of the cruise, he was on board of the Irresistable; towards the last of it. he was made master's mate, before. which time he had been before the mast. Q. Did you board a number of vessels? A. We did. Q. Were they also plundered? A. Some of them were. Q. What became of the money found in the Spanish vessel? A. It was shared among all hands. Q. Did you come into the waters of the United States, into the Chesapeake Bay? A. We did. Q. What became of the vessel? A. Com. Daniels sent down and took possession of her. Witness said the crew had abandoned and dispersed. (One of the jurymen.) Was it from apprehension? A. I cannot tell that. Being asked to specify the different flags under which they had sailed, he mentioned the Spanish, Buenos Ayrean, and English. The Buenos Ayrean flag was flying when she took the Spanish vessel. On cross examination, Stanly said that he had sailed in the Irresistable about six or seven months before she was taken by the crew of the Creola; that she had sailed from Baltimore. to make prizes under a commission from Gen. Artigas. Q. Did you not take vessels under the flag of Buenos Ayres? A. No. Q. Did you not conceive you had a right to take them? A. No; we could have taken them many a time. Q. Would you not have taken the Creola if found out of port? A. No. Q. Were you not apprised of there being a war between Buenos Ayres and Gen. Artigas?. A. I was. We had it in our power to take Buenos Ayrean privateers from Baltimore, but we did not attempt it. Q. While in the Irresistable, what prizes did you make? A. A ship and schooner belonging to the Portuguese. Being interrogated farther, he stated, that when the Irresistable was taken at Margaritta, he was in her asleep, and so were her crew; that fifty or sixty of the crew of the Creola had boarded her. Q. Do you know Poole? A. Yes. Q. Did you see him that night? A. No; not till the morning. They drove us below, and we had no chance of seeing till morning. He stated that the Irresistable was the strongest vessel; she mounted sixteen guns; the crew of the Creola had boarded her with two boats. Q. Had you no sentinel? A. Yes; but all were gone asleep. Q. How did you know then you were boarded with boats? A. I heard the captain say so, as well as several of the people. Q. How many were there in the crew of the Irresistable? A. About 25 or 30. Q. Was the prisoner very active? A. He was. Q. Who seemed the leader among them at that time? A. Ferguson. who was afterwards appointed captain. Q. Did you observe Black? A. He was first lieutenant at first. but they broke him. Being further questioned, in a desultory way, he stated that some of the old crew of the Irresistable were not willing to join; that when told they might go ashore, it was too late, being as much as fifty miles from land; that in the course of the cruise, they spoke about thirty or forty vessels, English, French. American, Dutch, Danes; that they boarded an American vessel bound to St. Jago; searched her trunks. and took jewelry from them. Q. When you boarded vessels, did you hear an order to take Spanish or Portuguese property. but no others? A. No. Q. But in boarding the American vessel, were orders given to respect American property? A. Yes. Upon being interrogated particularly how he came to call the vessel they took a Spanish vessel, he said she had a Spanish flag and Spanish crew. Q. Did you go on board of her? A. No; but they brought the crew on board of us to search their vessel. She was bound from Campeachy to Havana—she had four or five in her crew, besides officers and

passengers; was a very small vessel. Her captain told our captain in French he was a Spaniard. The witness, being interrogated, said he did not himself understand French or Spanish. Soon after he got to Baltimore, the witness said he was put in jail, and promises were held out to him that he should not be punished if he gave evidence in the case; that he was taken in the vessel in the Patuxent by the revenue cutter. His share of the money from the prize was $29; as to the jewelry, it was set up and sold in the vessel, and the proceeds shared out, of which he received $7 more. They had also plundered a Dutch vessel, from whom they had taken some hampers of gin; as also one of Petion's schooners, from whom they took clothes, money, watches, &c., which plunder was divided among the crew. Being asked by a juryman, if they were to take Spanish and Portuguese property only, why they robbed the American, he replied that they robbed the passengers only of jewelry, but did not rob the vessel. Q. Was the jewellery Spanish or American property? A. I do not know. Q. Why did you take gin from the Dutch vessel? Was that a Spanish vessel? A. No; but because we wanted it.

[Samuel Beaver: Was one of the crew of the Irresistable, when she was seized at Margaritta, in the month of March last; when taken, the boarding crew loosed her sails, and stood out to sea; hove to at daylight, and sent those ashore who chose to go; they said at first she was coming home to Baltimore, but they went a cruising; she carried the Margaritta flag generally; but when boarding vessels, they used different flags; they boarded eight or ten, Dutch, French, American, two Spaniards; one a Spanish brig off Cape Antonio; took from her $2,300. From the American vessel (the Superior) they took a cask of water and jewellery. The money they took was shared among the crew; they sold the jewellery and divided out the money. When they arrived in the Chesapeake Bay, the crew was called together, and divided; those who were for going out again went to one part of the vessel, the rest to another; the strongest party was for coming in, and the vessel was brought into the Patuxent. Q. Had you orders to respect particular vessels? A. No; we boarded one and all. We were prepared to take specie wherever we could find it. Q. What was the station of the prisoner in the Irresistable? A. He was captain of fore-top, and master's mate. Cross examined, he stated, that eighteen of the crew of the Irresistable were set ashore at Margaritta; that he did not try to get ashore, because he did not wish to be drowned, the boat being leaky and full of men and clothes; that he was below and drunk when the vessel was taken; that Captain Ferguson had told them at first he had a commission; but two days after he told them he had not; that after they found there was no commission, then they determined to board everything. Q. When you went on

board of a vessel, were you not told to take nothing but Spanish or Portuguese property? A. Yes; but if we saw any specie, it was ours. Q. Had you orders to take money wherever found? A. Yes. He stated, that he was arrested in Baltimore. and was told he should get a dollar and a quarter a day while attending as a witness.

[John Donald: Was one of the crew of the Creola; shipped at Baltimore under the Buenos Ayrean flag, for a 90 days cruise; at Margaritta the vessel was sold, and they had none to return home in, and were told the governor of Margaritta meant to press them. Captain Daniels had told some of the crew, whom he wished to enlist with him in the service of Venezuela, to which he had become attached, that if they did not join him, he would have them put into the fort, and fed on bread and water. Donald said, when he was asleep below, one of the crew of the Creola, who rose upon the vessel, came down to his berth, and threatened to blow out his brains if he did not join them in going against the Irresistable. They went in two boats, and seized the latter vessel; secured the men, and hoisted sail. The officers of the Creola were confined during the mutiny. Ferguson and Black were the leaders. Ferguson was proposed on the quarter deck of the Irresistable as captain—no one objected, and he was appointed officer. They had boarded a Spanish vessel, with logwood on board, and took from her (as he understood) $3,700 in specie. They boarded several vessels under the Buenos Ayrean flag; came across one of Petion's vessels, sent a boat aboard of her, took out jewellery, [there were several articles of it on the table of the court;] understood that this vessel was a pirate, and had no papers. They paid for the water taken from the American vessel, but does not know whether they paid for onions taken from the Dutchman. Q. You never thought of putting a prize-master on board of any of the vessels you saw? A. No; we would not have disturbed the vessel. Being cross examined, said there were orders to respect American property, and only to take Spanish and Portuguese.

[John M'Fadden: Was first lieutenant on board the Creola when she was seized; gave the particulars of that transaction; on the 24th of March the mutiny took place; they seized all the small arms; threatened to blow out the brains of the officer on deck. M'Fadden was below; when he went on deck, he found fifty men armed; tried to pacify them and quell them; they said they were not going to take our brig, but Captain Daniels'. ours not sailing fast enough: he thought at one moment he should have quelled the mutiny, but Black told them they would be strung on the beach, and hung like dogs, they then sung out, "as we have begun, let us go through with it"; they took all the small arms from the Creola; they said all might stay who chose; they wished none but volunteers; only four or five remained behind; Captain Daniels' other vessel tried

to pursue the Irresistable next morning, then in sight (about 20 miles off) from the mast head. Being further interrogated, said the Creola had a commission from Buenos Ayres; she was regularly commissioned: the crew shipped at Baltimore; cruise was finished at Margaritta. They did not think themselves authorized to take a vessel under the Artigas flag; on the contrary, he had known the two flags cruise together.—Mr. Stanard: Q. Does not the commission expressly restrict you from taking South American Spanish property? A. Yes; it is against the property of the subjects of the king of Spain.

[Henry Child: Had been the first officer of the Irresistable; was below when the Creola's crew came on board; he attempted to go up with a cutlass, but was taken and confined; they told him, as soon as things were arranged, they would give him the boat, and let him go ashore. Word was passed fore and aft for every one who wished to leave the vessel to go in the boat: he and nineteen men left it; the boat was in a leaky condition—much baggage in it, but had any more been willing to go with him, the baggage would have been thrown overboard. They overhauled his and Captain Daniels' trunks for the vessel's commission, but finding none, Ferguson said he could easily make papers for himself. When the Irresistable first arrived at Margaritta, the captain had taken all the papers on shore, to deposit them at the government house.

[Captain Paul: Was the commander of the Creola; was asleep in the cabin when the alarm was given; was suffered to go to the upper step of the gangway; was told they did not intend to injure his vessel, but to taken possession of the Irresistable; after leaving his vessel, he had fired at them, then went on board Captain Daniels' other vessel, which chased them eight hours in vain. Captain Paul being asked the date of his commission, said the original had been sent to Buenos Ayres, but a copy he had of it bore date in September, 1814. It did not justify him in taking any but Spanish property.

[Captain Daniels: Was the commander of the Irresistable; after the alarm was given, he was ordered by the governor to pursue her, but to no purpose; her boat returned to shore with twenty officers and men. The Irresistable had been engaged by the governor to sail to Venezuela in two days.

[The evidence being gone through, the court directed the jury to be kept together, and adjourned till next morning. On Tuesday morning the argument commenced. Mr. Stanard addressed the jury about an hour. On the part of the prisoner, Mr. Wickham spoke about half an hour, and Mr. Stevenson about an hour. Mr. Stanard closed on the part of the United States.

[The counsel on the part of the United States laid down the law, and analyzed the evidence. He called upon the jury, among other things, to lend their aid in cutting down that system of brigandage which was tarnishing the reputation of our country, and demoralizing our seamen. He cited the following passage from Bynkershoeck, to show what was piracy as defined by the laws of nations: "We call pirates and plunderers those who, without the authorization of any sovereign, commit depredations by sea or land," &c. &c.

[The counsel on the other side contended, that the words of the act of congress were too vague and loose to authorize the jury to dip their hands in the blood of a fellow citizen; that piracy was a general term, not clearly nor sufficiently defined in the laws of nations; that the great father of the church to whom you would look for a definition, gave no satisfaction upon it. What says Grotius? Not one syllable. Puffendorf? Profoundly silent. What Barbeyrac? Domat? Rutherford? Montesquieu? Wolfius? Vattel? Not a solitary word by way of definition: and the reason was, that it had been left to the municipal laws of different countries to define it, and, therefore, the law of nations had not. We have only the definition of one Dutchman, Byndershoeck; and even with that his commentator, Du Ponceau, had expressed his dissatisfaction. And yet the jury were to say upon their oaths that piracy had been defined by the law of nations. Why did not congress do their duty, in the exercise of their constitutional powers, and make a rule which might be understood by the judiciary of the country? If they had failed in doing their duty, it was their own look out; but surely no jury would take upon themselves to say by their verdict the law had been defined, when it was not; or upon such vague, general expressions, take the life of a fellow citizen. The counsel, by way of analogy, attempted to show that if congress had referred to other cases as defined by the law of nations, as territorial jurisdiction, the right of search, &c. how discordant the writers, and how unsettled the doctrines are upon the subject. Men, too, highly distinguished in this country, had differed upon the definition of piracy. The gentleman who presided in that court, had in another place, (in congress,) in the Case of Robins [Case No. 16,175], declared that not only an actual robbery, but cruising on the high seas without a commission, and with an intent to rob, was piracy. Whereas now, the United States' attorney says actual robbery is necessary to constitute the offence. Reference was also had to the constitution, by which congress is to define piracies and felonies committed on the high seas, and offences against the law of nations, to show that the former are distinguished from the latter, as if not ranked among the "offences against the law of nations." The evidence was then analyzed, and commented on. It was the testimony of accomplices, (always suspicious,) and here brought from duress of a jail, taking its colour from the hopes and

fears of the witnesses. It was attempted to be proven that they had contradicted themselves, and each other—that there was no satisfactory evidence of this being a Spanish vessel as charged in the indictment—that this act of congress was passed but ten days before they left Margaritta: they could not have known of it; and therefore it is as to them in the light of an ex post facto law, &c. &c. A particular and pathetic appeal was made in favour of Poole, who had served gallantly in the navy of his country during the late war.

[Mr. Stanard replied to both gentlemen at considerable length. He denied the vagueness which was ascribed to the law of nations on the subject of piracy, and the other points touched upon. He supported the authority of Bynkershoeck. Vattel (Law Nat. bk. 1, c. 19) had denounced "all villains who by the quality and habitual frequency of their crimes, violate all public security, and declare themselves enemies of the human race. Thus pirates are brought to the gibbet by the first into whose hands they fall!" Blackstone, the vade mecum of all the lawyers, says, "A pirate is an enemy of the human race." Even if writers on the law of nations had adopted different definitions of piracy, where was the definition of it that would not embrace the case of these men—whose lawless depredations came up to any definition of it which had ever been given? After developing this idea with great force, and ridiculing the pretensions that had been suggested, that these men had the right, under the commission belonging to the Irresistable, to capture Spanish property, he returned to the analysis of the testimony; he showed why the testimony of accomplices should be received; otherwise the most atrocious offences might escape with impunity. He concluded by a strong appeal to the jury in favour of the law—that the honour of our country required that the law should be put in force against brigands who not only sailed from its waters to collect plunder but returned to them as the scene for its partition, and as a sanctuary where they expected to escape the punishment of their crimes.] [2]

Mr. Stanard, U. S. Atty.

A. Stevenson and W. Wickham, for prisoners.

THE COURT then charged the jury in substance that the prisoner at the bar was indicted for cruising on the high seas without any commission, and boarding and plundering a Spanish vessel, or vessels belonging to some power to the jurors unknown; and piratically taking out of such vessel a sum of money, which the crew divided among themselves. The essential objects of inquiry were, whether the prisoner at the bar was engaged in such cruise without a commis-

[2] [From 2 Wheeler, Cr. Cas. 205.]

sion: whether the robbery charged in the indictment was committed by him and others so cruising as aforesaid, and whether the fact amounted to piracy under the act of congress.

The fact of cruising and plundering the Spanish vessel was proved by the testimony of accomplices, and it was contended by the counsel for the prisoner that they were totally unworthy of credit. It is undoubtedly true that the testimony of accomplices is to be heard with suspicion: and if their testimony should be improbable, or contradicted by circumstances, or by other testimony, the jury might justifiably discredit it; but if all the circumstances of the case, circumstances which could not be mistaken or misrepresented, corroborated the testimony of the accomplice, and in fact were merely connected by that testimony, it would be going too far to say that the facts supplied by the witness were to be disregarded because he was an accomplice. But in this case, one of the witnesses, Donald, had been acquitted by the grand jury because he was forced on board the vessel, and his testimony concurred with that of the other witnesses in all that was material.

If the robbery was committed, their next inquiry would be, whether the vessel committing it sailed under a lawful commission. There was not only no testimony whatever of a commission, but all the facts given in evidence were totally incompatible with the idea of sailing under any authority whatever. The crew of one vessel had mutinied, seized another vessel, and proceeded on a cruise under officers elected by themselves.

The question whether the case came within the act of congress was one of more difficulty. It was impossible that the act could apply to any case if not to this. The case was undoubtedly piracy according to the understanding and practice of all nations. It was a case in which all nations surrendered their subjects to the punishment which any government might inflict upon them, and one in which all admitted the right of each to take and exercise jurisdiction. Yet the standard referred to by the act of congress, as expressed in that act, must be admitted to be so vague as to allow of some doubt. The writers on the laws of nations give us no definition of the crime of piracy. Under the doubts arising from this circumstance, the court recommended it to the jury to find a special verdict, which might submit the law to the more deliberate consideration of the court.

The jury retired but for a few moments, and brought in a special verdict.

A jury was then impaneled, and the case of ten others of the crew (charged in the same indictment) was, with their consent, submitted at once to trial; the evidence gone through, and the jury returned the following special verdict:—

We of the jury find that the prisoners,

Bailey Durfey, William Chapels, alias William Chapel, Daniel Phillips, James Thomas, alias James West, Daniel Livingston, Luke Jackson, Stephen Sydney, Peter Nelson, Isaac Sales, and Peter Johnson, were, in the month of March, 1819, part of the crew of a private armed vessel called the Creola (commissioned by the government of Buenos Ayres, a colony then at war with Spain), lying in the port of Margaritta; that in the month of March, 1819, the said prisoners and others of the crew mutinied, confined their officers, left the vessel, and in the said port of Margaritta seized by violence a vessel called the Irresistable, a private armed vessel lying in that port, commissioned by the government of Artigas, who was also at war with Spain; that the said prisoners and others having so possessed themselves of the said vessel, the Irresistable, appointed their officers, proceeded to sea on a cruise without any document or commission whatever, and while on the cruise, in the month of April, 1819, on the high seas, committed the offense charged in the indictment, by the plunder and robbery of the Spanish vessel therein mentioned. If the plunder and robbery aforesaid be piracy under the act of congress of the United States, entitled "an act to protect the commerce of the United States, and punish the crime of piracy," then we find the said prisoners severally and respectively guilty. If the plunder and robbery above stated be·not piracy under the said act of congress, then we find them not guilty. John G. Gamble, Foreman.

THE COURT then adjourned.

[NOTE. This cause was certified to the supreme court, where it was argued at the February term, 1820, Justice Story delivering the opinion. It was decided that the offense charged in the indictment amounted to the crime of piracy, and was punishable under the act of congress entitled "An act to protect the commerce of the United States. and punish the crime of piracy." Act April 30, 1790 (1 Stat. 112). 5 Wheat. (18 U. S.) 153.]